**W. Wood PRINCE and James F. Donovan, as Trustees of the Central Manufacturing District, Plaintiffs,**

**v.**

**ROYAL INDEMNITY COMPANY, Defendant.**

**No. 73 C 3195.**

United States District Court, N. D. Illinois, E. D.

Dec. 2, 1975.

Gerard E. Grashorn and Stephen C. Bruner, of Winston & Strawn, Chicago, Ill., for plaintiffs.

John P. Gorman, of Clausen, Miller, Gorman, Caffrey & Witous, Chicago, Ill., for defendant.

MEMORANDUM OF DECISION

LYNCH, District Judge.

This is an action brought by the plaintiff to recover on a fire insurance policy issued by defendant. Jurisdiction in this Court is based on diversity, 28 U.S.C. Section 1332. The parties have submitted a stipulation of facts and hav-

ing waived a trial of the issues, seek this Court's decision based on the stipulation of facts as to which party is entitled to judgment. A summary of the parties' stipulation of facts follows:

Plaintiffs W. Wood Prince and James F. Donovan are and have been trustees of the Central Manufacturing District since before 1950. The Central Manufacturing District (hereinafter referred to as CMD) has been and presently is engaged in the business of purchasing and developing industrial real estate. Having developed real estate for industrial purposes, CMD would either sell that property to a purchaser, or lease the property to a tenant and manage it for the period of tenancy, receiving income for its managing services for the benefit of CMD's shareholders.

In 1958, a subsidiary of CMD acquired title to certain real estate located in an area of Chicago, Illinois, known as the "Crawford Industrial Development." This real estate was transferred to the trustees in 1965. Included in this real estate were two parcels which, at a later date, the trustees improved by the erection of a A & P grocery warehouse on one lot and a A & P grocery garage on a second lot. At all times relevant hereto, A & P leased these two pieces of property for the purposes of maintaining a warehouse to store canned food stuff and a garage to store and repair automobiles and trucks owned and operated by A & P.

In June or July of 1971, a representative of Goldman, Sachs inquired as to whether CMD would be interested in selling a large number of its real estate holdings to an insurance company on a cash basis. Eventually, Goldman, Sachs produced the Prudential Insurance Company of America (hereinafter referred to as Prudential) as a prospective purchaser of some of CMD's property. After lengthy negotiations, CMD and Prudential entered into an agreement dated November 22, 1972, by which Prudential agreed to purchase 69 separate and distinct parcels of CMD real estate. Of these 69 parcels, 64 were occupied by tenants pursuant to leases with CMD, and 5 parcels were vacant buildings. Included in the 69 parcels were the two parcels leased to A & P for the warehouse and garage. As to these two parcels, CMD had arranged for the purchase of fire insurance policies and paid the premium long prior to the November 22, 1972 agreement.

On November 22, 1972, a meeting (the first closing) was held between representatives of CMD and Prudential for the purpose of transferring title to 33 of the 69 parcels of real estate. At that meeting CMD's representatives produced and delivered a "Seller's Deed" which conveyed the 33 parcels to Prudential. Together with that deed, CMD delivered letters of opinion concerned with the condition of title of the parcels, leases, executed assignments of leases, various types of notices to each tenant occupying the premises, evidences of existence of fire insurance and executed assignments to Prudential of the interest of CMD in the fire insurance policies. Having examined these documents, the representative of Prudential pushed the evidences of fire insurance and the executed assignments of the policies to Prudential across the conference table to representatives of CMD, with the request for them to take care of delivering the assignments of the insurance policies to the proper insurance carriers for approval and acceptance. After receiving Prudential's check for the purchase price of these 33 parcels, the representatives of CMD agreed to comply with Prudential's request for them to take care of delivering the assignments of the insurance policies to the carriers for their consent.

The evidence of fire insurance and the executed assignments thereof were carried by representatives of CMD to CMD's office and were delivered to CMD's insurance manager with instructions to deliver the assignments to the proper insurance companies or their agents and arrange to have the various

insurance companies accept the assignments. Pursuant to these instructions CMD's insurance manager forwarded these assignments to the various insurance companies.

On December 15, 1972, a meeting (the second closing) was held between the same parties for the purpose of transferring title to 17 of the 69 parcels from CMD to Prudential. At this meeting, business was transacted in substantially the same manner as in the November 22, 1972 meeting. After the meeting adjourned representatives of CMD delivered the evidences of fire insurance and executed assignments thereof to CMD's insurance manager with instructions to deliver the assignments to the proper insurance companies or their agents and arrange to have the various insurance companies accept the assignments. However, CMD's insurance manager forwarded and received acceptance of only 3 of the 17 assignments, contrary to the instructions given to him.

On December 19, 1972, a third closing meeting was held for the purpose of transferring title to 1 of the 69 parcels from CMD to Prudential. Again business was transacted in a manner substantially similar to that in the prior two closings, and again CMD's insurance manager failed to follow instructions and forward the executed assignment wherein CMD assigned its interest in the insurance policy to Prudential to the proper insurance company for acceptance of the assignment.

On January 4, 1973, a fourth closing meeting was held for the purpose of transferring title to the last 18 of the 69 parcels of real estate from CMD to Prudential. Among the 18 parcels were the grocery warehouse and grocery garage leased to A & P. The transactions at the meeting took virtually the same form as the previous transactions. Again CMD's insurance manager, contrary to instructions, failed to forward to the proper insurance companies for acceptance the executed assignments of CMD's interest in the fire insurance policies to Prudential.

The two parcels of real estate on which were located the A & P grocery warehouse and garage were insured by CMD through defendant Royal Indemnity Company. The lease between CMD and A & P did not require the tenant to furnish and pay the fire insurance for the protection of the owner, CMD. Consequently CMD itself purchased the fire insurance policies and paid the premiums thereon. At the fourth closing representatives of CMD produced an assignment executed by the trustees of CMD of the insurance policy covering the two parcels leased to A & P. The grocery warehouse scheduled in the policy was insured against fire damage in the amount of $2,400,000, and the grocery garage, also scheduled in the same policy, was insured for $240,000. As mentioned previously, the assignment of CMD's interest in this policy to Prudential was never delivered to defendant Royal Indemnity for its acceptance. Royal Indemnity has never consented to the assignment.

On May 27, 1973, a fire occurred in the Crawford Industrial Development. Among the buildings destroyed or damaged were the two buildings insured under the Royal Indemnity Policy. The A & P grocery warehouse was completely destroyed, with a loss at least equal to the insurance in the sum of $2,400,000. The A & P grocery garage was damaged by the fire in the amount of $15,720. CMD notified Royal Indemnity's agents of the damage on May 27, 1975. After investigation by Royal Indemnity and its attorneys, CMD received a letter dated June 29, 1973, from Royal Indemnity in which the insurance company denied any liability for the loss due to the fire, giving as its reason that CMD's insurable interest terminated on January 4, 1973. Royal Indemnity also enclosed a check representing the return premium applicable to the two damaged or destroyed buildings. CMD returned this check and pressed its claim for the damaged property.

Counsel have stipulated, in substance, to the above outlined set of facts. The following facts are also stipulated to by counsel. However, defendant Royal Indemnity contends that they are irrelevant and immaterial.

At the first closing (November 22, 1972), one of the properties conveyed to Prudential was occupied by Vin-Tex Sealers, Inc., pursuant to a lease which required Vin-Tex Sealers to purchase fire insurance and pay the premium therefor, naming CMD as an insured. Vin-Tex purchased insurance from Royal Indemnity. Among the documents produced by CMD at the closing were a memorandum of this insurance and an executed assignment of CMD's interest therein. CMD's insurance manager, pursuant to direction, sought Royal Indemnity's acceptance of this assignment, which was received.

It wasn't until three days after the fire that CMD discovered that some or all of the assignments of fire insurance policies covering parcels transferred to Prudential at the last three closing dates were not forwarded to the respective insurance companies for their acceptance, but were still in CMD's possession. Having discovered this failure, CMD immediately sought acceptances of these assignments which were received from various insurance companies with the exception of Royal Indemnity, which refused to accept assignments of insurance policies covering the A & P properties, as well as property occupied by A–1 Tire Company under a lease from CMD. Through its agent, Corroon & Black, Royal Indemnity refused to accept the assignment of the A–1 insurance policy. Corroon & Black, as brokers, arranged for interim insurance on the A–1 property through a binder with another insurance company.

The stipulation also contains a photocopied page of a pamphlet used in training of employees of Royal Indemnity. The page deals with an explanation of insurable interest.

The stipulation further indicates that on June 5, 1973, representatives of CMD and Prudential met, at which time Prudential was advised that at the time of the fire CMD had not delivered the assignments of fire insurance on the A & P warehouse and grocery garage to Royal Indemnity, and that Royal Indemnity had not consented to the assignments before the fire. Prudential was further advised that Royal Indemnity denied any liability under the insurance policies for the reasons that Prudential was not a named insured and that CMD had no insurable interest. CMD and Prudential, after individual investigations by counsel as to CMD's liability to Prudential, then entered into an agreement whereby CMD returned the purchase price to Prudential for the two A & P properties, and Prudential deeded the properties back to CMD.

The complaint seeks a judgment under the policy for $2,415,729.00, plus interests, costs, and attorney's fees. That figure represents $2,400,000 for the total loss of the A & P grocery warehouse, and $15,729.00 for damages to the A & P grocery garage.

The issue that must be decided by this Court may be stated as follows: Whether CMD, having previously transferred title on January 4, 1973, to Prudential, and having failed to procure an acceptance of the assignment of rights under the fire insurance policy from CMD to Prudential, had an insurable interest in the two A & P properties at the time of the fire on May 27, 1973, such that it may recover under the terms of the fire insurance policy. Inasmuch as the property insured is located in Illinois, and it appears that the contract of insurance was entered into in Illinois, Illinois law will govern the determination of this issue.

Plaintiff contends that when the representatives of CMD agreed to procure acceptances of assignments of CMD's interest in the fire insurance policy to Prudential, CMD became liable to Prudential for the value of that policy for

which CMD failed to seek an acceptance of the assignment. It is plaintiff's contention that when the fire destroyed the A & P grocery warehouse and damaged the A & P grocery garage, CMD became liable for those losses to Prudential because CMD failed to perform its part of the oral contract with Prudential to acquire Royal Indemnity's consent to the assignment. By virtue of this putative liability, plaintiff claims to fall within the ambit of the definition of insurable interest.

For many years the law in Illinois has been settled that a party has an insurable interest in property from the existence of which he receives a benefit or from the destruction of which he will suffer a pecuniary loss, although he has no title to or possession of the premises. *Home Ins. Co. v. Mendenhall,* 164 Ill. 458, 45 N.E. 1078; *Beddow v. Hicks,* 303 Ill.App. 247, 25 N.E.2d 93.

Plaintiff's brief cites numerous cases standing for the proposition that where a vendor agrees to procure insurance for the property of the vendor and fails to do so, the vendor has an insurable interest in that property. Those cases are distinguishable from the present at least to the extent that in the present case the fire insurance was already procured, and the vendor failed to perform its promise to seek the consent to the assignment of a third party wholly distinct from the parties to the transaction.

While it is true that an insurable interest is predicated upon the economic benefit of the continuing existence of the property in question, or the economic loss due to the destruction of the property, that statement of the law, standing by itself, is inapplicable in light of the additional facts presented in this case as well as other rules of law relating to an insurance carrier's right to consent to assignments of its policies.

On the face of the policy issued by Royal Indemnity to CMD covering the warehouse and garage is the legend: "Assignment of this policy shall not be valid except with the written consent of this Company." Courts have uniformly upheld such express provisions in a fire insurance policy. See *Pfeffer v. Farmers State Bank of Schaumberg,* 263 Ill. App. 360; *Klefstad v. American Centry Ins. Co.,* 207 F.2d 288 (7th Cir. 1953). In the part of the stipulation contended by defendant to be irrelevant and immaterial, plaintiff offers evidence that after the first closing Royal Indemnity issued an acceptance of an assignment of a fire insurance policy covering the Vin-Tex property, and further that other insurance companies routinely accepted assignments of policies after CMD discovered its insurance manager had failed to forward those assignments for acceptance. Apparently, plaintiff seeks to establish an inference that Royal Indemnity would have routinely accepted an assignment from CMD to Prudential, had those assignments been promptly forwarded for acceptance, and that the only reason Royal Indemnity refused to consent to the assignment was that the subject matter of the policy was destroyed. The Court finds that evidence of what the defendant would or would not have done is irrelevant, in light of the simple fact that the defendant never consented to the assignment either prior to or after the fire of May 27, 1973.

█ In light of the facts stipulated to and the applicable law, this Court holds that where a named insured, under the terms and conditions of a fire insurance policy, transfers by deed pursuant to a real estate agreement all of its right, title and interest in the property covered by the insurance policy to a transferee, and immediately thereafter undertakes to procure a consent from the insurer to an assignment of its rights under the policy to the transferee, and then fails to perform that undertaking, the named insured will be deemed to have lost any insurable interest in the property covered by the insurance policy as of the time of delivery of the deed. A rule of law, such as that proposed by the plaintiff, which would create an insurable interest in the transferor by vir-

tue of his liability to the transferee for failure to perform his undertaking to procure an insurance company's consent to an assignment would serve to deny the insurance company of its right to consent to any assignment as provided for expressly in the insurance policy, and would serve to exculpate the transferor from liability for its own misfeasance or breach of contract with the transferee at the expense of the insurance company.

■■■ In light of the express provision for the written consent of the insurance company to any assignment of rights under a policy, and in light of the insured's total failure to perform its promise to seek the insurance company's consent to the assignment, the supposed liability of CMD to Prudential is not tantamount to the creation of an insurable interest in CMD. An insurable interest must exist in the property itself, or arise from some direct relationship to the property sought to be insured. The interest cannot arise from facts wholly extraneous to and separate from the destroyed property—an insurable interest in CMD in the destroyed property cannot arise by virtue of CMD's own misfeasance in performing its undertaking to procure Royal Indemnity's consent to the assignment of CMD's rights under the policy to Prudential.

For the above reasons, the Court holds that CMD's insurable interest in the A & P grocery warehouse and A & P grocery garage terminated on January 4, 1973, the date on which CMD transferred by deed the property to Prudential. This interest terminated not because title was transferred, but rather because CMD failed to perform its promise to obtain Royal Indemnity's consent to the asssignment, and CMD cannot now, after the property has been destroyed, exculpate itself from liability for its own misfeasance at the expense of Royal Indemnity. Having so held, this Court finds plaintiff's argument that a recission between CMD and Prudential served to reinstate an insurable interest in CMD with respect to the destroyed property to be without merit.

Accordingly, for the above mentioned reasons, the Court finds for the defendant on the stipulation of facts, and judgment is hereby entered in favor of defendant Royal Indemnity Company.